# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 24-506C
(Filed: January 15, 2026)

|  |  |
|---|---|
| **NATHAN D. WHITE,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| **UNITED STATES,** | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

*Justin W. Burnam* (argued), Covington & Burling LLP, Washington, DC, for plaintiff. *Richard L. Rainey* and *John Y. Veiszlemlein*, Covington & Burling LLP, Washington, DC; and *Rochelle Bobroff*, *Esther N. Leibfarth* (argued), and *Matthew Handley*, National Veterans Legal Services Program, Arlington, VA, Of Counsel.

*Joshua A. Mandlebaum* (argued), Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General, and *Particia M. McCarthy*, Director, and *Steven J. Gillingham*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice. *Maj. Nicole A. Oberjuerge* (argued), Litigation Attorney, Judge Advocate General's Corps, U.S. Army Legal Services Agency, Fort Belvoir, VA, Of Counsel.

## OPINION AND ORDER

**BONILLA, *Judge***.

Plaintiff Nathan D. White, a former enlisted member of the United States Regular Army and Army Reserve, seeks correction of his military records to reflect a medical retirement rather than his current disability separation. The difference between the health-related discharges carries significant financial consequence: medical retirement entitles a service member to lifelong retired pay under 10 U.S.C. § 1201(a), whereas disability discharge offers a single lump sum severance payment calculated under 10 U.S.C. § 1203(a). Mr. White reportedly suffers from service-connected post-traumatic stress disorder (PTSD) rooted in childhood trauma that returned to the fore during his military deployment.

Pending before the Court are the parties' cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC). For the reasons set forth below, plaintiff's dispositive motion is granted-in-part and denied-in-part, and defendant's dispositive cross-motion is conversely denied-in-part and granted-in-part. Plaintiff's dispositive motion is granted insofar as he seeks a remand for reconsideration of his medical retirement claim and denied insofar as he seeks the entry of judgment. Defendant's dispositive cross-motion is denied insofar as the government seeks the entry of judgment and granted insofar as the government alternatively seeks a remand for a determination whether plaintiff's PTSD diagnosis was related to combat or military sexual trauma. Accordingly, this matter is remanded to the Army Board for Correction of Military Records (ABCMR or Board) for further proceedings consistent with this opinion.

## BACKGROUND

### I.   Military Service

Mr. White enlisted in the Regular Army and entered active duty on February 4, 2009. Throughout his service in the Regular Army, Mr. White's military occupational specialty (MOS) was Aircraft Powerplant Repairer (15B), and he rose to the rank of Specialist (SPC/E-4).[1,2] After completing his military service obligation, SPC White was honorably discharged on August 3, 2015.[3] About four months before his discharge from the Regular Army, SPC White enlisted in the Army Reserve, committing to an additional three years of military service. After reporting certain medical issues, discussed *infra*, SPC White received a disability separation effective July 19, 2018, and a lump sum severance payment based on his monthly basic pay and years of service. Consistent with his tenure in the Regular Army, Mr. White's service in the Army Reserve was characterized as Honorable.

While serving in the Regular Army, on February 15, 2011, SPC White deployed to Kandahar, Afghanistan, in support of Operation Enduring Freedom. Four months

---

[1] According to the U.S. Army career website, an Aircraft Powerplant Repairer (MOS 15B) "inspect[s] and perform[s] maintenance on aircraft turbine engines and components to make sure they are safe and ready to fly. [They] diagnose and troubleshoot problems with airplane and helicopter engines and [perform] operational and safety checks." *See Aircraft Powerplant Repairer 15B*, U.S. ARMY, *available at* https://perma.cc/TX72-GRXB.

[2] While on active duty, Mr. White earned the following medals, badges, ribbons, and citations: Afghanistan Campaign Medal with two campaign stars, Army Achievement Medal (three), Meritorious Unit Commendation, Army Good Conduct Medal (two), National Defense Service Medal, Global War on Terrorism Service Medal, Army Service Ribbon, Overseas Service Ribbon (two), NATO Medal, Basic Aviation Badge, and a Certificate of Achievement.

[3] For clarity, and out of respect for his military service, the Court refers to plaintiff as "SPC White" during his enlistment periods and "Mr. White" during his civilian life before and after his military service.

into his deployment, on June 15, 2011, SPC White self-reported suicidal ideation and behavior to his technical inspector/section sergeant. His mental health episode was reportedly triggered by the confluence of debilitating shoulder pain from a recent physical training test injury, work stress, and childhood trauma flashbacks. In accordance with Army protocols, SPC White was disarmed, placed on unit watch (a/k/a "buddy watch"), and escorted to the mental health department of an in-theater medical clinic. Following a preliminary assessment, the Neuro-Psychiatric Mental Health Technician on duty considered SPC White a "low safety risk," but found the soldier "not fit for duty." AR 7415.[4] During a follow-up examination the next morning, a Psychiatric Mental Health Nurse Practitioner confirmed SPC White posed a safety risk and was psychologically unfit for duty, citing the soldier's "recent . . . suicidal ideation and initiation of [a] highly lethal suicide gesture." AR 7412. The advanced practice nurse (APN) prescribed medication, recommended continued psychotherapy, cautioned against returning the soldier's service weapon, and suggested "routine check-in[s] with [non-commissioned officer (NCO)] leadership" rather than continued "1:1 buddy watch." *Id.* A week later, the APN diagnosed SPC White with adjustment disorder with depressed mood and PTSD, referencing the soldier's childhood trauma "with stress induced exacerbation." AR 7394.

Two weeks later, during a July 8, 2011 follow-up appointment, the APN reported that "[SPC White] is no longer considered a safety risk" and medically cleared the soldier's return to full duty, including the return of his service weapon. AR 7368–69. Throughout the remaining months of his deployment, as recorded in the soldier's medical records, SPC White's mental, emotional, and physical health continued to improve. *See, e.g.*, AR 7349–50, 7353, 7356, 7359, 7362, 7728. After a July 25, 2011 session, for example, SPC White's therapist noted that the soldier's PTSD symptoms from his childhood trauma "have resolved." AR 7354.

SPC White's deployment to Afghanistan ended on January 28, 2012, whereupon he returned to his permanent duty station at Fort Campbell, Kentucky. During a March 9, 2012 intake medical appointment, SPC White declined additional psychotherapy and requested that his prescribed medication be discontinued. In support, SPC White cited the progress made during his extensive outpatient therapy in Afghanistan. When asked about his deployment, SPC White reportedly offered: "Never shot my weapon, no [improvised explosive devices (IED)], I never left the [forward operating base (FOB)]." AR 7313. The medical provider's notes further indicate that SPC White "[d]enied any combat[-]related trauma." *Id.*

On May 2, 2012, SPC White received permanent change of station orders directing him to report to Fort Wainwright, Alaska. The parties do not identify any relevant health issues or developments between May 2012 and January 29, 2014, when SPC White reportedly incurred a lower back injury while performing manual

---

[4] "AR ___" is a citation to the administrative record.

labor.  SPC White's resulting work limitations reportedly spurred behavioral issues and tension with at least one NCO.  *See, e.g.*, AR 351 ("[SPC White] says that he had a bad day yesterday. [He] says that something that was a joke turned into getting written up for disrespecting a non-commissioned officer.").  During a February 7, 2014 medical appointment, SPC White's provider prescribed him new ADHD medication[5] and diagnosed him with chronic PTSD and adjustment disorder with depressed mood.  The treating psychologist further documented and relayed to SPC White that he was "not deployable due to his Mental Health condition of PTSD and his medications."  AR 350.  Throughout SPC White's remaining enlistment period in the Regular Army, however, his medical providers generally described his PTSD as a thing of the past.[6]  Of note, on March 23, 2015, when SPC White formally agreed to enlist in the Army Reserve, his PULHES scores were "1" across the board, indicating "[n]o current psychiatric disorder."[7]  AR 376.

Following his transition to the Army Reserve in September 2015, SPC White was assigned to the 324th Expeditionary Signal Battalion in Greenville, South Carolina, and his new MOS was Nodal Network System Operator-Maintainer (25N2).[8]  SPC White failed to attend required MOS training and, consequently, never

---

[5] Mr. White was diagnosed with and treated for Attention-Deficit/Hyperactivity Disorder (ADHD) as a child.  Notwithstanding his acknowledgment of these facts during medical evaluations while on active duty, Mr. White reportedly denied having a history of ADHD during his December 8, 2008 pre-enlistment medical examination.

[6] *See, e.g.*, AR 8558 (Sep. 29, 2014 records indicating no current psychiatric disorder); AR 7115 (Sep. 18, 2014: "Past diagnoses [for PTSD and depression] seem to have been overcome except for ADHD."); AR 6996 (Mar. 20, 2015: "PTSD t[reatment] a couple y[ea]rs ago, but s[ymptoms] resolved and [SPC White] not t[reated] since.").

[7] P-U-L-H-E-S is a rough acronym documenting a soldier's medical profile, comprised of: physical capacity (P), upper extremities (U), lower extremities (L), hearing-ears (H), vision-eyes (E), and psychiatric (S).  Army Pamphlet 40-502, Table 4-2 (Dec. 18, 2023).  Service members are scored from 1 to 4 in each category, with 1 being the most fit and 4 being the least fit.  "An individual having a numerical designation of '1' describes a high level of medical fitness, deployable."  *Id.* ¶ 4-3(e)(1).  A score of 2 "indicates some medical condition or physical defect that requires some minor functional or activity limitations," but the soldier is nonetheless deployable.  *Id.* ¶ 4-3(e)(2).  Scores of 3 and 4 indicate a service member is not deployable until they have completed the requisite medical or administrative board process.  *Id.* ¶¶ 4-3(d), (e)(3)–(4).

[8] According to the Army National Guard website, "[t]he Nodal Network Systems Operator-Maintainer is responsible for making sure that the lines of communication are always up and running. They maintain strategic and tactical nodal systems."  *Nodal Network Systems Operator-Maintainer*, ARMY NAT'L GUARD, *available at* https://perma.cc/S65T-HPQW.  As described by SPC White's commander: "The Nodal Network Systems Operator-Maintainer supervises, installs, operates, and performs field-level maintenance on intellectual property (IP)-based, high-speed electronic nodal systems, integrated network control centers, network management facilities, associated multiplexing and transit-cased subscriber-interface equipment, Communications Security (COMSEC) devices, and other equipment associated with network nodal operations."  AR 395 (cleaned up).  The physical requirements of this role reportedly include lifting and carrying 150 pounds of equipment in a two-soldier team while wearing/carrying roughly eighty pounds of uniform and combat equipment.  AR 396.

qualified for his newly assigned role. He now submits that both his back injury and his PTSD prevented him from attending training, notwithstanding his ability to concurrently maintain a civilian job as a transmission assembler while working toward a bachelor's degree in information systems. Over the rest of his time in the Army Reserve, particularly between late 2016 and mid-2017, SPC White often missed drill.

In response to SPC White's chronic absenteeism, an Administrative Separation Board (ASB) was noticed on February 16, 2017, and formally convened on July 11, 2017. After hearing testimony from several witnesses, including SPC White, the ASB found: "SPC White has accrued nine or more unexcused absences from scheduled inactive duty training during a 12-month period." AR 391. The ASB recommended that SPC White be honorably discharged from the Army Reserve. The discharge order was revoked on July 28, 2017, however, when SPC White was referred into the Integrated Disability Evaluation System (IDES) for evaluation of his chronic lower back pain.[9] *See* Army Reg. 635-40 ¶ 4-3(f)(3) (Jan. 19, 2017) (IDES processing generally takes precedence over administrative separation action); *see also* Army Reg. 135-178 ¶ 1-10(a) (Nov. 7, 2017) (same).

II.    IDES

[IDES] is a joint [United States Department of Defense (DoD)] and [United States Department of Veterans Affairs (VA)] disability evaluation process. Under this system, VA helps DoD determine if wounded, ill, or injured Service members are fit for continued Military service and provide disability benefits to Service members and Veterans, if appropriate. IDES allows VA and DoD to share information and to complete each agency's respective process simultaneously, without the need for duplicative exams and ratings.[10]

IDES participants do not apply or elect to participate in IDES. Upon referral into IDES by their branch of service, each Service member is assigned a dedicated military Physical Evaluation Board Liaison Officer (PEBLO) and a VA Military Services Coordinator (MSC) to assist and advise.

Any Service member who participates in IDES can file a VA claim for disability compensation through their MSC. Service members determined to be unfit for duty receive a single set of disability ratings

---

[9] SPC White's chronic lower back pain and PULHES score of "3" for lower extremities is documented in his Physical Profile Record as a duty-limiting permanent profile as of July 28, 2016. AR 653.

[10] Prior to 2008, under the legacy Disability Evaluation System, the military branches conducted disability evaluation proceedings independently of the VA.

to determine the appropriate level of DoD and VA disability benefits. IDES participants found fit for duty continue their military service.

*Integrated Disability Evaluation System (IDES)*, U.S. DEP'T VETERANS AFFS., *available at* https://perma.cc/2YAU-36NU.

Upon referral, the soldier is examined by VA medical staff to assess the conditions prompting the IDES referral and any other issues or concerns raised by the service member. The Medical Evaluation Board (MEB)—comprised of military medical professionals—then evaluates whether the documented medical conditions meet retention standards under Army Regulation 40-501 (June 27, 2019) (Standards of Medical Fitness). *See* Army Reg. 635-40 ¶ 4-7(a). If the MEB determines that the soldier does not meet retention standards, the matter is referred to the Physical Evaluation Board (PEB) for a fitness determination.[11]  *Id.* ¶ 4-12(f). In turn, the PEB—comprised of medical and non-medical military personnel—evaluates whether the soldier's documented medical conditions merit separation or retirement. In doing so, the PEB assigns disability ratings based on the severity of the soldier's medical condition(s).[12]

In connection with the MEB, SPC White's commander completed a Disability Evaluation System (DES) Commander's Performance and Functional Statement (DA Form 7652) on August 5, 2017, wherein she rated the physical demands of his assigned MOS 25N (Nodal Network Systems Operator) as "heavy" and provided the following assessment of SPC White's ability to adequately perform his duties:

> Due to the high physical demands of duty MOS 25N, [SPC White] will not be able to adequately perform duties. . . . [SPC White] has a permanent profile that limits him from wearing [a] helmet and/or body armor. [He] is not deployable and cannot conduct MOS or Soldier specific training due to the restriction of wearing protective gear.
>
> . . . It is my assessment that [SPC White]'s conditions will prevent him from serving in his primary MOS (per contract) of 25N. He is not able to don body armor or lift heavy objects, which is essential to his job

---

[11] A soldier who disagrees with the MEB's determination may request an impartial medical review (IMR) by an independent medical provider (i.e., a provider not connected to the MEB). *See* Army Reg. 635-40 ¶¶ 4-13(a), 4-14(a)–(d). Depending on the outcome of the IMR, additional proceedings may be warranted. *See id.* ¶¶ 4-14(e)–(i), 4-15.

[12] The PEB identifies which conditions, if any, render a soldier unfit for continued military service; whether the conditions are service connected; and whether and to what extent an unfitting condition is compensable. *See* Army Reg. 635-40 ¶¶ 4-19, 4-22 to -24. There are two levels of review within the PEB: an informal PEB and a formal PEB that follows from a soldier's appeal of an informal PEB. *See generally id.* ¶¶ 4-22 to -24. A soldier may appeal the formal PEB decision to the United States Army Physical Disability Agency (USAPDA). *See id.* ¶¶ 4-25 to -27. From the USAPDA, soldiers may seek relief from the ABCMR. *See generally* 10 U.S.C. § 1552; Army Reg. 15-185 (Mar. 31, 2006).

function. [SPC White] also has permanent hearing loss that prevents him from operating in loud environments. He may also miss important cues in difficult listening environments.[13]

. . . Soldier has missed a substantial amount of [Battle Training Assemblies (BTA)] *due to re-injury of back.*

AR 395 (emphasis added). SPC White's commander made no reference to mental health concerns in general or to PTSD in particular. On the contrary, the commander consistently listed SPC White's psychiatric PULHES score as "1" (i.e., no current psychiatric disorder, deployable).[14] *Id.*

On October 3, 2017, SPC White sent the following email to VA medical staff related to the MEB process:

The reason for this message is as I am going through the MEB for the Army Reserve, I have been dealing with negativity from my command that is causing undue stress, and depression, and anxiety. I talked to my nurse case manager for the MEB and she told me to contact my psychologist and to ask for him to fill out a profile packet to pull me out of drill. . . . My nurse case manager just wants me pulled out until after my IDES process is complete, at which point I will be out of the Army Reserve medically separated or retired. . . .

AR 1478 (cleaned up). This appears to be the first time SPC White suggested that his mental health prevented him from attending drill. Rather than mention his PTSD or cite his 2011–12 deployment or childhood trauma, however, SPC White references only the current "negativity from [his] command" while participating in the IDES process. Thereafter, on October 12, 2017, SPC White filed an Application for Disability Compensation and Related Compensation Benefits (VA Form 21-526EZ). Adding to the MEB-referred disability of lumbosacral strain, SPC White listed a series of claimed ailments including "PTSD" and "adjustment disorder with depressed moods." AR 3343. The same day, SPC White submitted a new Army Reserve Medical Management Center Profile Request Letter of Instruction to reflect the following temporary conditions: "PTSD," "Anxiety," and "Depression." AR 2564.

Two weeks later, a psychologist confirmed SPC White's diagnoses of PTSD and inattentive ADHD. Of note, in documenting his medical opinion, the healthcare

---

[13] SPC White's reported hearing loss and corresponding PULHES score of "2" is documented in his Physical Profile Record as a duty-limiting permanent profile as of March 14, 2017. AR 653.

[14] In contrast, SPC White's commander listed differing PULHES scores for lower extremities (i.e., "2" and then "3") and for vision-eyes (i.e., "2" and then "1"). Additional limitations were consistently listed for physical capacity and hearing-ears as reflected by the PULHES scores of "2." *Id.* For completeness, SPC White's PULHES scores for upper extremities were consistently scored "1." *Id.*

provider discounted SPC White's childhood trauma,[15] instead attributing the soldier's PTSD to "enemy combatant-related" stress while deployed:

> [SPC White] reports [that] while serving in Afghanistan there was mortar fire nearly every day. He reports there were a number of other extremely distressing events that occurred at his base. He reports that there was one instance in which an infiltrator got inside the gate. He also reports [that] a car bomb exploded on his base. He reports that during these very stressful events he became so distraught that he considered suicide and told his command he was scared to carry and use a gun. He was eventually cleared to again carry a weapon after about two months of treatment and support.

AR 3571.[16]  During a November 7, 2017 follow-up evaluation, SPC White reported being less anxious and that his newly increased dose of an ADHD medication "helped decrease his stress 'by 70%.'"  AR 3270–71.

An MEB convened on November 21, 2017, to consider whether SPC White's eleven reported medical conditions—including lumbosacral strain, PTSD, and inattentive ADHD—met the Army's medical retention standards.  After reviewing the case file, the MEB concluded that only SPC White's January 2014–incurred lower back injury "d[id] not meet" the applicable retention standard.  AR 399 (citing Army Reg. 40-501 ¶ 3-39) (alteration to capitalization).  As for the other ten ailments, including PTSD and inattentive ADHD, the MEB concluded that each of those medical conditions "meets" the applicable retention standard.  *Id.* (citing Army Reg. 40-501) (alteration to capitalization).  An IMR requested by SPC White affirmed the MEB's findings, which were formally approved and deemed final on December 19, 2017.  Consistent with the MEB's findings, SPC White's case was referred to the PEB for a fitness determination.

An informal PEB convened on January 31, 2018, and determined SPC White's chronic lower back injury was unfitting.  In support, the informal PEB cited the physical demands of SPC White's assigned MOS provided by the soldier's commander, as well as the commander's assessment of SPC White's performance limitations.[17]  The informal PEB recommended a disability rating of twenty percent

---

[15] *See* AR 3571 (documenting medical opinion that SPC White's childhood trauma does not support PTSD diagnosis).

[16] The October 24, 2017 report is contradicted by SPC White's March 9, 2012 account of his deployment. AR 7313 ("Deployments: 'it was alright other than the unit stress and childhood stuff. Once I got into therapy and on meds, things improved. Never shot my weapon, no IEDs, I never left the FOB.' Denied any combat related trauma.").

[17] As addressed *infra*, notwithstanding the informal PEB's reliance on SPC White's Army Reserve commander's description of the soldier's then-current MOS (i.e., 25N) in "Section III: Medical Conditions Determined To Be Unfitting," the informal PEB listed SPC White's previous MOS

and that SPC White be medically separated with a severance payment.[18]  The informal PEB further determined that SPC White's other ten medical conditions, including PTSD and inattentive ADHD, were not unfitting.  In response to an appeal by SPC White, the informal PEB's findings and recommendations were confirmed, and a formal PEB convened on April 13, 2018.  Following a hearing, the formal PEB reaffirmed the findings and recommendations of the informal PEB.  Addressing SPC White's reported PTSD, the formal PEB remarked: "There is no evidence that this condition has precluded him from military duties."[19]  AR 454.  SPC White's appeal to the PEB President was denied on May 15, 2018.  He was then separated from the Army Reserve effective July 19, 2018.

## III.  ABCMR

On July 1, 2022, nearly four years after his separation from the Army Reserve, Mr. White applied to the ABCMR for correction of his military records to reflect medical retirement in lieu of his disability separation.[20]  Mr. White principally asserted that the PEB should have found his PTSD unfitting and assigned him at least a fifty percent (combined) disability rating, warranting a medical retirement.[21]  In support, SPC White challenged the PEB's: reliance on, and characterization of, his civilian employment; dismissal of his commander's expressed safety concerns for

---

[18] (i.e., 15B) in both Section III and "Section I: Administrative Data."  AR 416 (alteration to capitalization).

[18] If the PEB had found a disability rating of at least thirty percent for unfitting conditions—in addition to finding that SPC White's lumbosacral strain and PTSD were "of a permanent nature and stable," were "not the result of [SPC White's] intentional misconduct or willful neglect, and w[ere] not incurred during a period of unauthorized absence"—SPC White would be entitled to medical retirement rather than a disability separation.  *See* 10 U.S.C. § 1201(b).

[19] During VA examinations conducted on November 30, 2015, and February 23, 2016, SPC White's healthcare providers found no signs of PTSD.  AR 6583–85, 6682.  Although the VA assigned SPC White a 60% (combined) disability rating for certain medical conditions (including left shoulder and lumbar strains) on March 8, 2016, the agency documented he did not have PTSD.  AR 6538, 6540.  VA and Army doctors thereafter examined SPC White at least six times between March 23, 2016, and August 17, 2017, each time indicating he was not suffering from PTSD while periodically referencing his long-term ADHD diagnoses.  *See, e.g.*, AR 2539, 2550, 2558, 3321, 6245, 6323.  Notwithstanding this history, on May 23, 2017, the VA issued SPC White a 10% disability rating for service-connected ADHD (with a general reference to PTSD) effective August 4, 2015 (i.e., "the day following the date of [SPC White's] military discharge"), elevated to 30% effective March 20, 2017.  AR 6057–60.  On January 23, 2018, the VA converted SPC White's mental health diagnoses to PTSD with attention deficit disorder (ADD) and increased this disability rating from 30% to 50% effective October 5, 2017, coinciding with the MEB and PEB proceedings.  AR 408–10.  A month later, the VA rolled back the effective date of the 50% disability rating for PTSD with ADD to May 12, 2017.  AR 810, 812–13.  The VA ultimately assigned SPC White a combined disability rating of 90%.

[20] The ABCMR excused Mr. White's failure to seek administrative relief within the three-year period codified at 10 U.S.C. § 1552(b).

[21] In addition to his PTSD diagnosis, Mr. White challenged the PEB's conclusions related to his reported left lumbar lower extremity radiculopathy (LER).  That issue is not raised here.

SPC White and the unit; assignment of SPC White's reported impulse control as a unique symptom of his previously-diagnosed ADHD rather than a contemporaneous PTSD symptom; and conclusion that Mr. White's PTSD was seemingly manageable with conservative treatment. After requesting a recommendation from the Army Review Boards Agency (ARBA) Medical Advisor and then summarizing SPC White's military service, SPC White's medical history, and the IDES (MEB and PEB) proceedings, the ABCMR summarily denied relief on June 13, 2023.

Mr. White filed suit in this Court on April 4, 2024, alleging the ABCMR's decision was arbitrary, capricious, unsupported by substantial evidence, and contrary to law. Among his claims, Mr. White charged that the ABCMR applied the wrong regulatory fitness standard, failed to liberally consider his PTSD claim as required by statute, ignored evidence, and abandoned its responsibility to perform an independent analysis. The Court then granted defendant's unopposed request for a voluntary remand to facilitate the ABCMR's reconsideration of Mr. White's claims. The Board issued its remand decision on November 18, 2024, again denying relief. Briefing on the parties' dispositive cross-motions, including supplemental questions posed by the Court (ECF 21), was completed on November 14, 2025. Oral argument took place on December 18, 2025.

## ANALYSIS[22]

### I.    Standard of Review

In adjudicating cross-motions for judgment on the administrative record under RCFC 52.1, the Court resolves factual disputes as it would at trial: by making factual findings in accordance with the weight of the evidence presented. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). A decision of the ABCMR, however, "may only [be] set aside . . . if it was 'arbitrary or capricious, unsupported by substantial evidence, or otherwise not in accordance with law' . . . ." *See Doyon v. United States*, 58 F.4th 1235, 1242 (Fed. Cir. 2023) (quoting *Fisher*, 402 F.3d at 1180). Reviewing courts "do not substitute [their] judgment for that of the military 'when reasonable minds could reach differing conclusions on the same evidence.'" *Mote v. United States*, 110 F.4th 1345, 1354 (Fed. Cir. 2024) (quoting *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983)).

To obtain relief from a decision by the ABCMR, a plaintiff must demonstrate that the Board's decision should be set aside by "cogent and clearly convincing evidence." *Id.* (quoting *Dodson v. United States*, 988 F.2d 1199, 1204–05 (Fed. Cir.

---

[22] The Court has jurisdiction over this medical retirement pay action under the Tucker Act, 28 U.S.C. § 1491(a). *Dillon v. United States*, No. 24-2307, 2025 WL 2528324, at *2 (Fed. Cir. Sep. 3, 2025) (per curiam) ("The Claims Court has jurisdiction to hear claims under 10 U.S.C. § 1201, which is money-mandating for the purposes of the Tucker Act." (citing *Fisher v. United States*, 402 F.3d 1167, 1174–75 (Fed. Cir. 2005))).

1993)). "The Court will uphold a decision of 'less than ideal clarity,' if the Court can reasonably discern the Board's actions." *Dillard v. United States*, 165 Fed. Cl. 214, 227 (2023) (citing *Sokol v. United States*, 120 Fed. Cl. 144, 151 (2015)), *quoted in Martin v. United States*, 175 Fed. Cl. 239, 276 (2025); *accord Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974). "Moreover, 'military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." *Martin*, 175 Fed. Cl. at 262 (quoting *Dodson*, 988 F.2d at 1204) (additional citations omitted); *accord Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) ("Judicial deference must be 'at its apogee' in matters pertaining to the military and national defense." (first quoting *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981); and then citing *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953))).

Nevertheless, the ABCMR must explicitly analyze and make findings with respect to "all relevant criteria" under the applicable regulations. *See Kelly v. United States*, 69 F.4th 887, 896 (Fed. Cir. 2023). Failure to do so renders an ABCMR decision arbitrary and capricious. *See Kelly v. United States*, 157 Fed. Cl. 114, 130 (2021), *vacated and remanded on other grounds*, 69 F.4th 887; *Kelly*, 69 F.4th at 896 (agreeing that a decision by the Board for Correction of Naval Records (BCNR) was arbitrary and capricious because the BCNR did not explicitly analyze and make findings with respect to "all relevant criteria enumerated" in applicable regulations).

## II. Fitness Determinations

By statute, when a military Secretary deems a member of the armed forces with fewer than twenty years of service "unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay," the member may be medically retired or separated if certain other conditions are satisfied. *Compare* 10 U.S.C. § 1201(a) (medical retirement), *with id.* § 1203(a) (medical separation). For medical retirement, the diagnosed disability must, among other things, be "of a permanent nature and stable," be "based upon accepted medical principles," and merit a disability rating of "at least 30 percent under the standard schedule of rating disabilities in use by the [VA] at the time of the determination." *See id.* § 1201(b)(1), (b)(3)(B). The bar for separation is lower: separation is proper where the disability "is or may be of a permanent nature" and yields a disability rating of "less than 30 percent." *See id.* § 1203(b)(3), (b)(4)(A).

As for substantive fitness determinations, the DoD and the Army have promulgated governing instructions and regulations, respectively, in accordance with 10 U.S.C. § 1216(a). Under this regulatory scheme, soldiers are presumed fit for duty

absent a showing of preponderant evidence to the contrary.[23]   DoDI 1332.18 ¶ 6.5 (Aug. 5, 2014); Army Reg. 635-40 ¶ 5-1.  According to the DoD Instruction:

> A Service member may be considered unfit when:
>
>> a. The evidence establishes that the member, due to disability, is unable to reasonably perform the duties of their office, grade, rank, or rating, including those during a remaining period of Reserve obligation; or
>>
>> b. The evidence establishes that their disability:
>>
>>> (1) Represents a decided medical risk to their health or to the welfare or safety of other members; or
>>>
>>> (2) Imposes unreasonable requirements on the military to maintain or protect the Service member.

DoDI 1332.18 ¶ 6.2; *accord* Army Reg. 635-40 ¶¶ 5-1, 5-3.  Paragraph a. accords with the statutory language included in 10 U.S.C. §§ 1201(a) and 1203(a).  For enlisted soldiers, the Army Regulation further defines the applicable duties as "[t]he duties of an enlisted Soldier's PMOS at the Soldier's current rank and skill level." Army Reg. 635-40 ¶ 5-2.  Paragraph b. of the DoD Instruction codifies what are commonly referred to as the "risk and burden" factors.  Although not mentioned in the governing statutes, this Court has ruled that the risk and burden factors can be decisive.  As explained in *Hassay v. United States*, for example, a finding that continued military service would pose "a decided medical risk" under paragraph b. precludes a determination that the service member is able to reasonably perform their duties under paragraph a.  150 Fed. Cl. 467, 479 & n.10 (2020).

    In Count I, Mr. White charges that the ABCMR misapplied the above instructions and regulations in assessing his claim.  As an initial matter, the Court addresses the MEB's and PEB's citations to SPC White's prior Regular Army MOS (i.e., 15B) rather than his assigned Army Reserve MOS (i.e., 25N).  AR 399, 416. Mr. White argues that by focusing on his Regular Army MOS rather than his Army Reserve MOS, the PEB completed the wrong analysis.  To the extent this could have

---

[23] During oral argument, counsel for Mr. White asserted that a soldier is presumed fit only where the soldier in fact desires to be found fit.  While the presumption of fitness is nominally based on "the presumption that the Soldier desires to be found fit for duty," Army Reg. 635-40 ¶ 5-6(a), the applicable regulation further provides that "[a] Soldier will be considered unfit when the preponderance of evidence establishes that the Soldier, due to disability," meets the legal standard of unfitness, *id.* ¶ 5-1. The burden thus remains on the party seeking to prove unfitness to do so by preponderant evidence, regardless of whether the soldier desires to be found fit.

been legal error by the PEB, it was corrected by the ABCMR, which correctly identified Mr. White's Army Reserve MOS and explained:

> There is no evidence of record [SPC White] ever attended and successfully completed [Active Duty Training (ADT)] for MOS 25N qualification or was ever awarded MOS 25N as either his primary or secondary MOS while in the [Army Reserve]. The evidence of record shows [SPC White]'s only awarded MOS was 15B, which was awarded during his period of service in the Regular Army; therefore, that is his MOS of record.

AR 25.

Yet Mr. White is correct in his charge that the ABCMR was required—and failed—to perform a task-by-task assessment of his reported PTSD symptoms against the specific duties of a Nodal Network Systems Operator-Maintainer (MOS 25N). Despite the intuitive appeal of the government's argument that an employer cannot be expected to evaluate the specific abilities of an employee who does not show up for work, the military is not an ordinary employer and, of course, service members are not ordinary employees. Even where a service member has stopped attending drill and training, in determining that the service member's disability is not unfitting, the military is required to list the service member's specific MOS duties and explain why the disability does not prevent the service member from performing those duties. *See Kelly*, 69 F.4th at 896.

Instead of listing the specific duties associated with MOS 25N, the ABCMR concluded from Mr. White's ability to perform in his prior MOS, his ability to perform a civilian job, and his failure to demonstrate a meaningful difference between these activities, that he did not prove that PTSD prevented him from doing his job:

> In deciding whether [Mr. White]'s PTSD prevented him from performing his duties, the Board determined [Mr. White] did not establish an inability to perform the duties of a [25N] Nodal Network Systems Operator[-]Maintainer in the Army Reserve . . . . The Board noted [Mr. White] had been able to perform his previously assigned duties for several years while still on active duty, and then elected to join the Army Reserve. It was only after enlisting in the Reserve that [Mr. White] started to allege his inability to perform any of his assigned duties. [Mr. White] does not explain why he had been able to perform the duties of his prior MOS, but not those of his MOS in the Army Reserve. . . . [T]he Board also noted [Mr. White] did not provide any information on his ability to maintain a civilian job, which would have strengthened his case if his PTSD were truly debilitating.

> . . . Ultimately, given [Mr. White]'s successful completion of his deployment and active duty term, the Board was convinced that [Mr. White]'s failure to perform in the Army Reserve was more due to his failure to show up for duty than due to his PTSD. The Board took note of [Mr. White]'s assertion that the failure to report for duty was due to symptoms of PTSD; however, [Mr. White]'s former positive performance on active duty and his decision to enlist in the Reserve led the Board to conclude that [Mr. White]'s PTSD was not a significant cause of his failure to attend training or scheduled duty.

AR 58–59. This analysis, while relevant, falls short of the specific duty-by-duty assessment that the applicable instructions and regulations require under *Kelly*, 69 F.4th 887. Accordingly, this case must be remanded to the ABCMR to perform such an assessment in the first instance. On remand, although the Board may choose to reiterate much of the analysis it already performed, it must supplement its analysis with an explicit discussion of SPC White's MOS 25N duties and whether PTSD rendered him unable to perform them.

Mr. White next argues that the ABCMR improperly disregarded his Army Reserve commander's concerns for his safety and the welfare of the unit and failed to consider the burden the military would have had to bear to protect him from the threats posed by his PTSD. The commander's February 23, 2018 statement, included in a Memorandum for Record, reads:

> SPC Nathan White is currently under my command . . . . He currently has health problems that he states prevent him from drilling. One such health problem is his mental health. During the MEB process he reported having a mental breakdown and his physician recommended that he not attend Battle Assemblies because of his condition. I am excusing him from participating as it is not beneficial to the Army Reserve or the Soldier. I am concerned about his safety and the safety of the unit due to his reported PTSD.

AR 425.[24]

Contrary to Mr. White's assertions, the ABCMR duly "evaluated [SPC White]'s fitness for duty based upon . . . whether his PTSD posed a medical risk to his health or to the welfare or safety of other personnel." AR 58. The Board recounted SPC White's June 2011 mental health episode, concurred with his service-connected PTSD diagnosis, and acknowledged his then-current commander's expressed concerns. In discounting—rather than dismissing—this evidence, the ABCMR: inventoried the countervailing data points documenting SPC White's treatment and

---

[24] SPC White's staff sergeant also expressed concerns about SPC White's mental health and physical limitations in a March 12, 2018 letter addressed to the PEB President. AR 428–29.

14

recovery; highlighted SPC White's continued active-duty service throughout the remaining four years of his service in the Regular Army; noted the soldier's March 2015 enlistment in the Army Reserve; took into account the commander's lack of medical expertise and her personal unfamiliarity with SPC White's reported PTSD symptoms, citing SPC White's chronic absenteeism from training and drill; and noted SPC White's contemporaneous civilian employment in a similar field of work. After weighing the evidence, "the Board determined [Mr. White] did not establish . . . that he posed a health or safety risk to himself or others."[25]  AR 58.  On this record, the Court cannot find that the ABCMR failed to properly consider whether SPC White's PTSD posed a risk to himself or the welfare of his unit.

Although the ABCMR performed the required analysis and rendered the requisite findings with respect to the "risk" factor, the Court cannot, in light of the Federal Circuit's precedent in *Kelly*, 69 F.4th 887, simply infer that the ABCMR's "risk" analysis and findings apply with equal force to the "burden" factor. It is not clear what daylight, if any, there may be between the risk and burden factors, but the Court leaves it to the ABCMR to explicitly consider—and render findings regarding—the burden factor on remand. In other words, the ABCMR must explicitly analyze and state its conclusion in the first instance as to whether SPC White's PTSD "[i]mpose[d] unreasonable requirements on the military to maintain or protect" him. DoDI 1332.18 ¶ 6.2.b(2).

## III.    Liberal Consideration

In Count II, Mr. White asserts the ABCMR violated 10 U.S.C. § 1552(h) by failing to apply "liberal consideration" to the fitness determination underlying his disability retirement claim. On this count, the parties disagree as to (1) whether the ABCMR is *ever* statutorily required to apply liberal consideration to fitness determinations; (2) assuming the ABCMR is required to apply liberal consideration to fitness determinations in some cases, whether this is such a case; and (3) further assuming liberal consideration is triggered in this case, whether liberal consideration requires something more than the consideration the ABCMR already afforded Mr. White.

Under § 1552(h), when a former service member petitions a BCM/NR[26] to review their "discharge or dismissal," and the claim "is based in whole or in part on matters relating to [PTSD] or traumatic brain injury [(TBI)] . . . related to combat or military sexual trauma," BCM/NRs "shall . . . review the claim *with liberal consideration* to the claimant that [PTSD] or [TBI] potentially contributed to the circumstances resulting in the discharge or dismissal or to the original

---

[25] Of note, a March 19, 2018 psychologist's report that Mr. White complains the ABCMR ignored concludes with the following mental competency statement: "[SPC White] is NOT a danger to himself or others."  AR 446.

[26] "BCM/NR" refers to all of the military record correction boards, including the ABCMR.

characterization of the claimant's discharge or dismissal." *Id.* (emphasis added). As noted *supra*, the parties' principal dispute is whether fitness determinations may ever be subject to liberation consideration.

Addressing this legal issue, the ABCMR noted: "per current applicable policy" interpreting 10 U.S.C. § 1552(h), liberal consideration categorically does not apply to fitness determinations. AR 58. The referenced policy is found in an April 4, 2024 memorandum issued by then–Acting Under Secretary of Defense for Personnel and Readiness Ashish S. Vazirani (the "Vazirani Memo"). Issued in the wake of the Federal Circuit's decision in *Doyon*, the Vazirani Memo includes the following directives regarding mental health condition–based claims for retroactive medical retirements and separations under 10 U.S.C. § 1552:

> It is DoD policy that the application of liberal consideration does not apply to fitness determinations, an entirely separate Military Department determination regarding whether, prior to "severance from military service," the Applicant was medically fit for military service (i.e., fitness determination). While the BCM/NRs are expected to apply liberal consideration to discharge relief requests seeking a change to the narrative reason for discharge in accord with *Doyon*, they should not apply liberal consideration to retroactively assess the Applicant's medical fitness for continued service prior to discharge in order to determine how the narrative reason should be revised.
>
> . . .
>
> Accordingly, in the case of an Applicant described in 10 U.S.C. § 1552(h)(1) who seeks a correction to their records to reflect eligibility for a medical retirement or separation, the BCM/NR will bifurcate its review. First, the BCM/NR will apply liberal consideration to the eligible Applicant's assertion that combat- or [military sexual trauma–]related PTSD or TBI potentially contributed to the circumstances resulting in their discharge or dismissal to determine whether any discharge relief, such as an upgrade or change to the narrative reason for discharge, is appropriate. After making that determination, the BCM/NR will then separately assess the individual's claim of medical unfitness for continued service due to that PTSD or TBI condition as a discreet [sic] issue, *without applying liberal consideration to the unfitness claim or carryover of any of the findings made when applying liberal consideration.*

ECF 45 at 445–46 (emphasis added). Limiting the application of the liberal consideration evidentiary standard, the Vazirani Memo further explained:

> [A]ny request for a medical retirement or separation necessarily asserts the existence of an error or injustice in the previous *failure* of the Service to discharge the individual for unfitness, rather than in the circumstances of individual's actual discharge or dismissal. As such, 10 U.S.C. § 1552(h) cannot be read to require the application of liberal consideration to assess whether a qualifying PTSD or TBI condition potentially contributed to the circumstances resulting in a medical discharge which never occurred.

*Id.* at 445 (emphasis in original).  Mr. White argues that, in instructing the military record correction boards to categorically refrain from applying liberal consideration to fitness determinations, the Vazirani Memo is contrary to 10 U.S.C. § 1552(h).  The Court agrees.

In the above-quoted passage, the Vazirani Memo seeks to distinguish between "the previous *failure* of the Service to discharge the individual for unfitness," to which liberal consideration purportedly cannot apply, and "the circumstances of the individual's actual discharge or dismissal," to which liberal consideration would apply.  This case demonstrates why the distinction drawn in the Vazirani Memo is both contradictory and unworkable.  Mr. White asserts error in the "failure of the service to discharge [him] for unfitness" *on the very ground* that the ABCMR should have recognized that PTSD "contributed to the circumstances of [his] discharge or dismissal."  ECF 27 at 44–45; 10 U.S.C. § 1552(h).  That is, Mr. White asserts that PTSD contributed to the circumstances of his separation by preventing him from showing up to drill and training, thereby rendering him unfit and requiring his medical retirement.

The Vazirani Memo suggests, and the government maintains, that the "circumstances resulting in" a soldier's discharge should be limited by the specific narrative reason recited in the soldier's DD Form 214 or other discharge order.  Here, for instance, the government cites SPC White's physical disability (i.e., lumbosacral strain) as the narrative basis for his unfitness-based separation—a reason entirely independent of his mental health–based PTSD claim.  The Court rejects the government's attempt to construe the "circumstances resulting in" a soldier's discharge so narrowly.  The relevant inquiry—whether a soldier's PTSD "potentially contributed to the circumstances resulting in [their] discharge or dismissal . . . ," *see* 10 U.S.C. § 1552(h)(2)(B)—reaches beyond the military's stated reason for the challenged separation to the factual underpinnings resulting in the end of one's military career.  The "circumstances resulting in" a soldier's discharge must include, at a minimum, any performance issues that triggered the proceedings culminating in the discharge.  Here, those issues would be SPC White's chronic failure to attend drill and MOS training while in the Army Reserve.  The ABCMR could not conceivably review such issues with liberal consideration while, at the same time, shielding its fitness inquiry from liberal consideration.  When liberal consideration applies, it reaches both the factual underpinnings of a service member's discharge and any

fitness determination based on those underlying facts.  Invoking the basic tenet of improv, these claims must be constructed in functional terms: "Yes, *And* . . . ."

This approach closely follows the Federal Circuit's reasoning in *Doyon*.  As here, *Doyon* involved a former service member challenging the underlying basis for his disability separation in an effort to secure a medical retirement under § 1201(a).  58 F.4th at 1237, 1240–41.  Specifically, the Vietnam War veteran sought to correct his military record to reflect an *unfitting* service-connected PTSD diagnosis rather than the *unsuitable* personality disorder diagnosis cited in his discharge.  *Id.*  The Federal Circuit rejected the government's position that the liberal consideration evidentiary standard codified in § 1552(h) "is limited to misconduct-based upgrades or modifications to a service member's characterization of service (characterization upgrades)—e.g., changing a service member's discharge from dishonorable or less-than-honorable to honorable."  *Doyon*, 58 F.4th at 1242–48.  Rather, the Federal Circuit ruled that liberal consideration applied more broadly to the narrative reason for the discharge, explaining: "Had Congress intended to limit liberal consideration only to upgrading or modifying a service member's characterization of service, the statute would not include the alter[n]ative 'circumstances resulting in the discharge' clause as an additional, separate ground for liberal consideration."  *Id.* at 1247 (citing 10 U.S.C. § 1552(h)(2)(B)).

Moreover, "a veteran's challenge to the recorded narrative reason for discharge necessarily encompasses the factual determinations necessary to correct or maintain the narrative reason."  *Doyon*, 58 F.4th at 1244.  As noted *supra*, in the case of a veteran seeking medical retirement based on unfitness, it is unclear how a BCM/NR could possibly apply liberal consideration to the "factual determinations necessary to correct or maintain the narrative reason" without applying liberal consideration to the underlying fitness determination.  *Id.*  Indeed, nothing in the statutory or regulatory scheme directs the bifurcated approach adopted in the post-*Doyon* Vazirani Memo, whereunder liberal consideration applies to a veteran's challenge to the narrative reason for discharge but not to the fitness determination on which the narrative reason is based.  For these reasons, the Court concludes that the Vazirani Memo is contrary to law and that fitness determinations are not categorically excluded from the application of liberal consideration.

The next issue is whether the ABCMR was required to apply liberal consideration *in this case*.  The Court, however, cannot answer this question in the first instance.  Liberal consideration is triggered only where a claimant's PTSD or TBI is "related to combat or military sexual trauma, *as determined by the Secretary concerned*."  10 U.S.C. § 1552(h)(1) (emphasis added).  The Secretary of the Army, acting through the ABCMR, has made no such determination with respect to SPC White.  Thus, on remand, the ABCMR should (1) determine in the first instance whether SPC White's PTSD was related to combat or military sexual trauma and, if so, (2) apply liberal consideration to the issue whether his PTSD "potentially

18

contributed to the circumstances resulting in" his discharge—including, insofar as it is implicated, whether SPC White's PTSD rendered him unfit for service.

Even if the ABCMR determines that SPC White's PTSD was combat- or military sexual trauma–related and, consequently, that it should apply liberal consideration to his claim, however, it is unclear whether Mr. White's claim will fare any better on remand. In the Court's view, liberal consideration does not have quite the substantive force that Mr. White contends it does. True, liberal consideration would require the ABCMR to afford Mr. White's claim particularly careful consideration, which the Board indicated it did not do. AR 58 (declining to apply liberal consideration). But liberal consideration would neither alter Mr. White's burden to prove unfitness by preponderant evidence nor require the ABCMR to pen a more detailed rationale for denying his claim.[27] These conclusions become clear through analysis of what, exactly, "liberal consideration" means.

Chapters 61 and 79 of Title 10, United States Code, addressing Retirement or Separation for Physical Disability and Correction of Military Records, respectively, do not define "liberal consideration." *See generally* 10 U.S.C. §§ 1201–22, 1551–59. Accordingly, the Court must turn to the origin of the nebulous phrase for guidance. *See Percipient.AI, Inc. v. United States*, 153 F.4th 1226, 1236 (Fed. Cir. 2025) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it." (quoting *George v. McDonough*, 596 U.S. 740, 746 (2022))), *cert. denied*, __ S. Ct. __, No. 25-428, 2026 WL 79975 (U.S. Jan. 12, 2026) (mem.). Three years before Congress enacted § 1552(h), then–Secretary of Defense Charles ("Chuck") T. Hagel issued guidance to BCM/NRs considering PTSD-based discharge upgrade requests. The September 3, 2014 memorandum and attached guidance (the "Hagel Memo") shined a light on the "previously unrecognized" mental health condition now diagnosed as PTSD, particularly as it related to Vietnam War veterans. ECF 45 at 436–37. The guidance focused on veterans whose characterization of service was Other than Honorable (a/k/a a "bad paper" discharge) based on perceived misconduct potentially attributable to undiagnosed PTSD.[28] The guidance declared: "Liberal consideration will be given in petitions for changes in characterization of service to Service treatment record entries which document one or more symptoms which meet the diagnostic criteria of [PTSD] or related conditions." *Id.* at 438. The guidance then specified two areas of application: determining whether PTSD existed at the time of service/discharge and, if so, assessing whether the mental health condition mitigates the reason for the bad paper discharge. Explaining the need for this approach, the Hagel Memo highlighted the difficulties in documenting a

---

[27] For the reasons explained elsewhere in this opinion, however, the Board is required to offer a more detailed written rationale than it has on other issues, such as risk, burden, and deployability.

[28] A "'bad paper' discharge" generally refers to any characterization of service less than Honorable.

previously unrecognized mental health condition and establishing a causal nexus between that condition and the cited misconduct.

The term "liberal consideration" was adopted by Congress in enacting the National Defense Authorization Act for Fiscal Year 2017 (FY2017 NDAA), Pub. L. No. 114-328, 130 Stat. 2000 (Dec. 23, 2016). Through Section 535, Congress amended the statute authorizing Discharge Review Boards (DRB), 10 U.S.C. § 1553—distinct from BCM/NRs, 10 U.S.C. § 1552—which review applications for changes in the narrative reason for, and character of, a service member's discharge.[29] Relevant here, Congress added subsection 1553(d)(3), directing DRBs to review the cases of former service members whose applications are based in whole or in part on a claim that PTSD (or TBI) potentially contributed to the circumstances resulting in their bad paper discharge "with liberal consideration." *See* 130 Stat. at 2123–24 (current version at 10 U.S.C. § 1553(d)(3)).[30]  The amendment's sponsor, Senator Gary C. Peters, explained:

> While scars, lost limbs, and other injuries are readily apparent to the eye, there are thousands of veterans coping with the invisible wounds of war. We have far too many servicemembers who are suffering from trauma-related conditions such as [PTSD] or [TBI]. Unfortunately, many of these have received a less-than-honorable discharge, also known as a bad paper discharge. These former servicemembers often receive bad paper discharges for minor misconduct—the same type of misconduct that is often linked to behavior seen in those suffering from PTSD, TBI, and other trauma-related conditions.
>
> . . .
>
> . . . Bad paper discharges make former servicemembers who are suffering from service-connected conditions ineligible for a number of benefits that they need the most. . . .
>
> . . .
>
> This amendment builds upon the policy guidance issued by former Defense Secretary and Vietnam veteran Chuck Hagel. The 20[1]4 Hagel memo instructed liberal consideration to be given when reviewing discharge status upgrade petitions for PTSD-related cases at

---

[29] Narrative "Reason for Discharge" and "Character of Discharge" are terms of art denoting standard information included in a service member's formal discharge papers (usually a DD Form 214).  *See* DoDI 1332.28 § E3.1.3 (Apr. 4, 2004).  Narrative "Reason for Discharge" refers to the narrative for separation (e.g., "completion of required active service") included in Box 28.  "Character of Discharge" refers to the characterization of service (e.g., Honorable) included in Box 24.  *See, e.g.*, AR 587 (SPC White's May 29, 2015 DD Form 214 for his discharge from active duty).

[30] More recent amendments to § 1553(d)(3) are immaterial to this analysis.

the military department boards for correction of military and naval records. The Peters amendment would codify the commonsense principles of the Hagel memo, ensuring that liberal consideration will be given to petitions for changes in characterization of service related to PTSD or TBI before [DRBs].

162 CONG. REC. S3258–59 (daily ed. May 26, 2016) (statement of Senator Gary C. Peters). Given the explicit statement that the amendment to the statute "builds upon" the Hagel Memo's instruction to apply "liberal consideration" to certain military discharge claims, the term should be understood consistently with its meaning in the Hagel Memo—at least as it is used in § 1553. *Percipient.AI*, 153 F.4th at 1236 (quoting *George*, 596 U.S. at 746).

The following year, then–Acting Under Secretary of Defense for Personnel and Readiness Anthony M. Kurta issued clarifying guidance. The August 25, 2017 memorandum and attached guidance (the "Kurta Memo") made clear that the military's liberal consideration standard for mental health conditions, now codified in § 1553(d)(3), applied to both DRBs and BCM/NRs. The Kurta Memo then outlined the areas of "discharge relief" where liberal consideration should apply: first, determining whether PTSD existed during military service/at discharge; and second, assessing whether the mental health condition excuses or mitigates the reason for discharge. ECF 45 at 441–44. The Kurta Memo also clarified the types of discharge-related relief service members may seek, including changes to a service member's characterization of service, narrative reason for discharge and coinciding separation code, and reenlistment code. Similar to the Hagel Memo, the Kurta Memo highlighted the need for adopting the liberal consideration standard in light of practical evidentiary issues that had historically plagued mental health condition–based claims.

Two consistent evidentiary principles emerge from the Hagel and Kurta Memos. First, liberal consideration moderates the scrutiny with which evidence must be examined when determining whether service-connected PTSD *existed* during service and/or at discharge. *See Jeanpierre v. United States*, 176 Fed. Cl. 11, 18 (2025) ("At minimum, the liberal consideration standard is a relaxed evidentiary standard." (citing *Bee v. United States*, No. 21-1970, 2024 WL 3912596, at *9 (Fed. Cl. Aug. 23, 2024), *appeal docketed*, No. 24-2306 (Fed. Cir. Sep. 12, 2024)[31])). Second, DRBs and BCM/NRs are required to carefully consider[32]—and then, in writing, explicitly address—whether and to what extent service-connected PTSD or TBI excuses or mitigates the misconduct underlying the service member's discharge.

---

[31] Oral argument in *Bee* is scheduled for February 6, 2026.

[32] When applying liberal consideration, the military record correction boards should refer to the Hagel and Kurta Memos for more detailed guidance on what this consideration entails.

Four months later, Congress passed the FY 2018 NDAA, Pub. L. No. 115-91, 131 Stat. 1283 (Dec. 12, 2017).  Through Section 520, Congress added subsection (h) to 10 U.S.C. § 1552.  131 Stat. at 1379.  The new subsection provides:

(1) This subsection applies to a former member of the armed forces whose claim under this section for review of a discharge or dismissal is based in whole or in part on matters relating to [PTSD] or [TBI] as supporting rationale, or as justification for priority consideration, and whose [PTSD] or [TBI] is related to combat or military sexual trauma, as determined by the Secretary concerned.

(2) In the case of a claimant described in paragraph (1), a board established under subsection (a)(1) shall—

(A) review medical evidence of the Secretary of Veterans Affairs or a civilian health care provider that is presented by the claimant; and

(B) review the claim *with liberal consideration* to the claimant that [PTSD] or [TBI] potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the claimant's discharge or dismissal.

10 U.S.C. § 1552(h) (emphasis added).[33]  This language is nearly identical to that used in subsection 1553(d),[34] signaling the more-lenient evidentiary standard applies equally in proceedings before DRBs and BCM/NRs under the *in pari materia* canon of statutory construction.  *Strategic Hous. Fin. Corp. of Travis Cnty. v. United States*, 608 F.3d 1317, 1330 (Fed. Cir. 2010) ("Under th[e *in pari materia*] canon, courts should interpret statutes with similar language that generally address the same subject matter together, 'as if they were one law.'" (some internal quotation marks omitted) (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972))); *cf. Monsalvo v. Bondi*, 604 U.S. 712, 726 (2025) ("[I]dentical words and phrases within the same statute should normally be given the same meaning." (quoting *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007))).

To be clear, the liberal consideration evidentiary standard does not disturb the presumption of fitness or shift the burden of persuasion.  Thus, assuming *arguendo* that liberal consideration applies, to convert his current physical disability–based separation into a mental health–augmented medical retirement, Mr. White must rebut the presumption of his mental health fitness and prove by preponderant

---

[33] Section 1552 has since been amended four times, but the original language of subsection (h) remains.

[34] The 2018 NDAA included a conforming amendment tailoring certain language in subsection 1553(d) to align with subsection 1552(h).  *See* 131 Stat. at 1379.  Only immaterial differences remain.  *Compare* 10 U.S.C. § 1553(d)(3)(A)(ii) (referring to a "case" and a "former member"), *with id.* § 1552(h)(2)(B) (referring to a "claim" and a "claimant").

evidence that his PTSD rendered him unfit for continued Army Reserve service. *Heisig*, 719 F.2d at 1157; *see* DoDI 1332.18 ¶ 6.6; Army Reg. 635-40 ¶ 5-1. "When Congress adopts a new law against the backdrop of a 'longstanding administrative construction,'[35] this Court generally presumes the new provision should be understood to work in harmony with what has come before." *Monsalvo*, 604 U.S. at 725 (first quoting *Haig v. Agee*, 453 U.S. 280, 297–98 (1981); then citing *United States v. Hill*, 506 U.S. 546, 553–54 (1993); and then citing *FDIC v. Phila. Gear Corp.*, 476 U.S. 426, 437 (1986)); *accord U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621 (2020) ("[W]hen Congress wishes to 'alter the fundamental details of a regulatory scheme,' . . . we would expect it to speak with the requisite clarity to place that intent beyond dispute." (some internal quotation marks omitted) (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 515 (2018))). Mr. White's contentions to the contrary are unavailing.

Invoking a provision of the Kurta Memo, Mr. White posits that, when a service member proffers evidence of service-connected PTSD, the PTSD is presumed to have caused the behavior warranting that service member's separation or discharge. Proceeding from this premise, he further asserts this presumption may only be rebutted by "clear evidence to the contrary." ECF 27 at 16 (emphasis omitted) (quoting ECF 27-6 at 4). This reversed presumption reflects a misreading of the Kurta Memo. In context, under the heading "Was there a condition or experience?" the Kurta Memo provides: "Absent clear evidence to the contrary, a diagnosis rendered by a licensed psychiatrist or psychologist *is evidence* the veteran had a condition that *may* excuse or mitigate the discharge." ECF 27-6 at 4 (emphasis added). Read plainly, this portion of the Kurta Memo creates a presumption that a diagnosis by a licensed medical professional *serves as evidence* that the service member had a mental health condition that *might* (i.e., "may") excuse or mitigate their separation or discharge—not that such evidence should be assigned any particular weight or that a service member's alleged condition in fact excuses or mitigates their discharge.

Having clarified what liberal consideration does—and does not—mean, the Court now considers the substance of the ABCMR's decision. The ABCMR accepted Mr. White's service-connected PTSD diagnosis. The Board then assessed the service member's fitness for duty. In doing so, the ABCMR explicitly addressed whether PTSD excused or mitigated SPC White's absences from drill and training—i.e., the behavior that undisputedly led to Mr. White's separation from the Army Reserve. As explained by the ABCMR:

> In deciding whether [Mr. White]'s PTSD prevented him from performing his duties, the Board determined [Mr. White] did not establish an inability to perform the duties of a Nodal Network Systems

---

[35] The requirement that unfitness be proven by preponderant evidence is "longstanding," as it dates back to at least 1983, when the Federal Circuit decided *Heisig*. *See* 719 F.2d at 1157.

Operator[-]Maintainer [(MOS 25N2)] in the Army Reserve or that he posed a health or safety risk to himself or others. *Rather, the evidence showed that he generally did not show up at all to his assigned duties.*

AR 58 (emphasis added). In support, the Board cited SPC White's successful completion of his Regular Army term of enlistment, subsequent civilian employment and, as detailed *supra*, found the safety and welfare concerns expressed by SPC White's chain of command lacking in personal knowledge and medical expertise. Addressing "[Mr. White]'s assertion that [his] failure to report for duty was due to symptoms of PTSD," the ABCMR explained that the former service member's years of "positive performance on active duty and his decision to enlist in the [Army] Reserve led the Board to conclude that [Mr. White]'s PTSD was not a significant cause of his failure to attend training or scheduled duty."[36] AR 59.

Put differently, Mr. White advanced a principal argument that his PTSD "potentially contributed to the circumstances resulting in the discharge" under 10 U.S.C. § 1552(h)(2)(B): that his failure to show up to drill and training, which resulted in his discharge, was symptomatic of his PTSD. Assuming liberal consideration applies to Mr. White's claim, the ABCMR was required to carefully consider and then explicitly address the merits of this argument. While the ABCMR appears to have explicitly addressed whether PTSD contributed to the circumstances of SPC White's discharge, the Court is not convinced that the Board *carefully considered* the merits of that argument in accordance with the Hagel and Kurta Memos—particularly in light of the Board's statement, at the outset of its opinion, that it would *not* apply the liberal consideration standard to Mr. White's claim. If, on remand, the Board determines that liberal consideration is triggered and that PTSD did not contribute to the circumstances resulting in SPC White's discharge, the Court cannot require the Board to explicitly discuss more than it already did in its June 13, 2023 decision. Although helpful in any post-remand review, to require such precision would impermissibly stray from the statutory language, alter the longstanding

---

[36] The ABCMR's decision is supported by the ARBA Medical Advisor's assessment:

> There is evidence [SPC White] was absent from his place of duty [in] the [Army Reserve] on numerous occasions for a variety of reported reasons. While there is a nexus between avoidant behavior and PTSD, this is not sufficient evidence of a mental health condition[ that] would be determined to be medically unfitting. The applicant was not placed on a psychiatric profile for this condition, he did not submit any documentation that his behavioral health condition has adversely affected his Army duties, he never required inpatient psychiatric treatment, and he did not attend therapy specifically for this condition for over six months without improvement.

AR 57.

requirement that unfitness be proven by preponderant evidence, and impinge on the discretion properly afforded to the military in making fitness determinations.[37, 38]

## IV. Consideration of Evidence

In Count III, Mr. White contends the ABCMR either ignored or failed to properly consider certain evidence supporting his medical unfitness/retirement claim, including his formal PEB hearing testimony, a psychologist's diagnoses during the IDES process, his VA disability ratings, and the safety and welfare concerns expressed by SPC White's wife and former Army Reserve commander.[39] On these issues—even assuming liberal consideration applies—Mr. White fails to prove "by cogent and clearly convincing evidence that the correction board acted arbitrarily, capriciously, contrary to law, or that its determination was unsupported by substantial evidence." *Mote*, 110 F.4th at 1354 (quoting *Dodson*, 988 F.2d at 1204–05). While the ABCMR must explain the rationale for its decision in writing, Army Reg. 15-185 ¶ 2-13, that obligation is limited: "the [military record correction board] is not required to detail its assessment of every piece of evidence in the record, nor resemble 'a model of analytic precision to survive a challenge.'" *Osburn v. United States*, 171 Fed. Cl. 38, 45 (2024) (first quoting *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995); and then citing *Sokol*, 120 Fed. Cl. at 151), *aff'd*, No. 24-2025, 2025 WL 3719434 (Fed. Cir. Dec. 23, 2025). Stated differently, the decision need only include enough detail to enable the Court to reasonably discern the ABCMR's analytical path. *Sokol*, 120 Fed. Cl. at 151 (citing cases). At bottom, it is the ABCMR's *conclusion* (i.e., SPC White's PTSD was not unfitting) that is reviewed for substantial evidence, not the ABCMR's decision to focus its written opinion on some evidence over other evidence, or the ABCMR's assessment and assignment of comparative evidentiary weight. *See Heisig*, 719 F.2d at 1157.[40]

---

[37] This Court recently noted that "the presence or absence [of] the phrase 'liberal consideration' should not dictate whether liberal consideration was actually applied." *Bee*, 2024 WL 3912596, at *9, *quoted in Jeanpierre*, 176 Fed. Cl. at 32. That principal does not extend to situations where, as here, the Board explicitly stated it did not apply liberal consideration.

[38] To the extent the Board decides to deliberately review the evidence using the "liberal consideration" standard, the Court reminds the Board of the "concepts" included in "liberal consideration," as outlined in the Kurta Memo. ECF 27-6 at 5–6.

[39] Having already addressed Mr. White's claim regarding his Army Reserve commander's concerns, the Court will not revisit that issue.

[40] Mr. White's reliance on *Fuentes v. United States*, 157 Fed. Cl. 433 (2021), and *Valles-Prieto v. United States*, 159 Fed. Cl. 611 (2022), is unavailing. In both *Fuentes* and *Valles-Prieto*, this Court found that the military record correction boards erred in concluding that "no evidence" supported an unfitness determination notwithstanding the existence of contradictory evidence in the record presented. *See Fuentes*, 157 Fed. Cl. at 463; *Valles-Prieto*, 159 Fed. Cl at 617–18. Here, as in *Mazarji v. United States*, the military record correction board reviewed and accurately summarized the entire record before crediting medical and anecdotal evidence showing that SPC White's claimed medical condition was not unfitting. *See* 164 Fed. Cl. 298, 310–11 (2023).

During his April 10, 2018 appearance before the formal PEB, SPC White testified about the impact of his PTSD symptoms on his personal and family life, civilian career, and Army Reserve service. Addressing his civilian employment as a machinist, SPC White spoke of being easily offended and quick to anger. In one exchange, SPC White expressed that he had been concerned about losing his civilian job when he misinterpreted a "joke" in a text from his production manager. Consistent with the ABCMR's findings, however, SPC White made no mention of chronic absenteeism or difficulties in showing up for his civilian job.[41] ECF 27-1 at 9. The ABCMR accurately recounted the sum and substance of this evidence. *See, e.g.*, AR 13, 19–20, 31–32, 35–36, 41, 45. While SPC White's PEB testimony and his wife's letter are not specifically cited in the Board Discussion section of the ABCMR's written decision, the relative import of this evidence is referenced: "Finally, the Board also noted the applicant did not provide any information on his ability to maintain a civilian job, which would have strengthened his case if his PTSD were truly debilitating." AR 59.

With respect to his concomitant Army Reserve duties, SPC White testified:

I was struggling to even show up [to drill] because I felt like, one, [my Army Reserve unit] didn't really care about me as a soldier and about my situation; and two, there's been a few times where my back went out . . . and I would have a doctor's note and I'd request the [rescheduling of training], and they kept denying me because I didn't have an updated [physical fitness] test.

ECF 27-1 at 9. As addressed *supra*, the ABCMR did consider (and address) SPC White's statement that his PTSD excused or mitigated his chronic absenteeism and consequent discharge. The ABCMR was simply unpersuaded in light of the volume of contemporaneous evidence to the contrary.

Mr. White's citations to the psychologist's October 27, 2017 PTSD Disability Benefits Questionnaire (DBQ), supplemented on March 19, 2018, and his VA disability rating are similarly unavailing. The ABCMR accurately summarized the history and substance of the PTSD DBQ and resulting VA disability rating. *See, e.g.*, AR 6, 10–12, 18, 25–26, 30, 33–35. Consistent with the medical advisory opinion requested from the ARBA, the ABCMR limited their probative value, explaining:

---

[41] In an April 5, 2018 letter to the PEB, SPC White's wife reiterated the substance of SPC White's testimony regarding the impact of his mental health issues and physical limitations. Similarly absent from her letter is any mention of Mr. White's difficulty in showing up for his civilian job. AR 450.

[T]his evaluation was initially directed at the applicant's level of disability in regard to the VA system of disability. It is not sufficient evidence to determine the applicant medically unfit for military service as the result of PTSD.

AR 58; *see* AR 222–23, 225 (ARBA Medical Advisory Opinions).   To be clear, "VA disability ratings and the exams on which they are based constitute relevant evidence that must be considered in determining unfitness for duty." *Bee*, 2024 WL 3912596, at *15 (citing *Valles-Prieto*, 159 Fed. Cl. at 618).  This is particularly true where, as here, the medical examination is part of/occurs contemporaneously with the IDES process.  *See id.*; *cf. Hinkle v. United States*, 229 Ct. Cl. 801, 804 (1982) (per curiam) (VA disability rating issued five years after discharge "has no probative value" regarding the service member's fitness for duty at separation).  That said, "VA disability ratings are not binding on the service branches and are 'in no way ultimately determinative of claims for military disability retirement.'" *Bee*, 2024 WL 3912596, at *15 (quoting *Hinkle*, 229 Ct. Cl. at 805).

    As explained in *Hinkle*: "The awards of the [VA] are in the nature of gratuities by a grateful nation and extend to nonservice-connected disabilities as well as those believed to be service-connected. The [VA] does not determine fitness for military duty, which is the responsibility of the Secretary and military authorities." 229 Ct. Cl. at 805 (collecting cases).   One reason why a VA rating might be unpersuasive in a fitness inquiry is that, before the VA, reasonable doubt is resolved in the claimant's favor; a veteran need only prove that they are as likely as not to have a service-connected disability and a certain disability rating.[42]  The cited PTSD DBQ illustrates this point. The psychologist opines only that "it is at least as likely as not that [Mr. White's] PTSD was incurred during his military service," and that "[Mr. White's] PTSD is as likely as not to be 'unlikely to significantly improve or deteriorate[.]'"  AR 733–34; AR 446.   Fitness inquiries, by contrast, require the claimant to overcome the presumption of fitness and prove unfitness by preponderant evidence (i.e., more likely than not).   DoDI 1332.18 ¶¶ 6.5–6.6; Army Reg. 635-40 ¶¶ 5-1, 5-5, 5-6.

    Here, the ABCMR found the PTSD DBQ and VA disability rating unpersuasive.  In support, the ABCMR focused on the timeline of medical and anecdotal evidence documenting SPC White's June 2011 mental health episode, positive response to medical treatment, recovery, completed deployment, continued service on active duty in the Regular Army through 2015, interim enlistment in the Army Reserve, and continuing engagement in similar civilian employment.  While

---

[42] *See* 38 C.F.R. § 3.102 (In VA proceedings, "[w]hen . . . reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant. By reasonable doubt is meant one which exists because of an approximate balance of positive and negative evidence which does not satisfactorily prove or disprove the claim.").

remand is warranted for other reasons, there was no error in how the ABCMR weighed the PTSD DBQ and VA disability rating at issue.

V.    Deployability

Finally, Mr. White asserts the ABCMR failed to adequately address his deployability. Per Army Regulation 635-40, deployability is among the list of factors to be considered in determining whether a Soldier's medical impairments preclude the Soldier from reasonably performing their duties. Army Reg. 635-40 ¶ 5-4(a), (e). The regulation further provides that, absent exceptions not relevant here, "the PEB will find Soldiers unfit who are medically disqualified for worldwide deployment in a field or austere environment." *Id.* ¶ 5-4(e)(2). Under *Kelly*, 69 F.4th at 896, failure to explicitly analyze and make findings with respect to deployability is error.

In rejecting Mr. White's claim of PTSD-based unfitness, the closest the ABCMR came to addressing his deployability was in commenting that, "given [SPC White]'s *successful completion of his deployment* and active duty term, the Board was convinced that [SPC White]'s failure to perform in the Army Reserve was more due to his failure to show up for duty than due to his PTSD." AR 59 (emphasis added). This analysis falls short. At best, this might be understood as an analysis of SPC White's deployability in or around January 2012, when he completed his deployment to Afghanistan; but the ABCMR was tasked with considering his deployability at the time of his discharge proceedings from the Army Reserve, which began over five years later. *See Stine v. United States*, 92 Fed. Cl. 776, 795 (2010), *aff'd*, 417 F. App'x 979 (Fed. Cir. 2011) (per curiam). While there is evidence of SPC White's mental health deployability leading up to his discharge from the Army Reserve—including several PULHES scores of "1," indicating "deployable" psychiatric condition—the ABCMR did not discuss that evidence or render the required *current* deployability finding in denying his unfitness claim. On remand, the ABCMR must consider all the evidence weighing in favor of and against SPC White's deployability, offer a reasoned analysis of the issue, and make an explicit finding as to whether SPC White's PTSD rendered him undeployable at the time of his discharge from the Army Reserve.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for judgment on the administrative record (ECF 27) is **GRANTED-IN-PART** and **DENIED-IN-PART**, and defendant's cross-motion for judgment on the administrative record (ECF 32) is **DENIED-IN-PART** and **GRANTED-IN-PART**:

(1) Pursuant to RCFC 52.2(a), this military pay case is **REMANDED** to the ABCMR for further proceedings consistent with this opinion.

(2) Pursuant to RCFC 52.2(b)(1)(A), the ABCMR must **RECONSIDER** Mr. White's medical retirement claim.

a. If the ABCMR again denies Mr. White the relief sought, the ABCMR must **ISSUE** a written decision in full compliance with applicable statutes, instructions, and regulations, consistent with this opinion.

b. In the case of a denial, the ABCMR's written decision must **INCLUDE** a discussion section that includes (but is not limited to):

    i. Analysis of each of the following criteria, as described in this opinion and applicable regulations: risk, burden, and deployability. The ABCMR must additionally render findings with respect to each of these criteria.

    ii. Analysis of SPC White's specific MOS 25N duties, including a discussion determining whether and to what extent his PTSD interfered with his ability to perform those duties. The ABCMR must render findings with respect to whether and to what extent SPC White's PTSD interfered with his ability to perform those duties.

    iii. Analysis of whether SPC White's PTSD was related to combat or military sexual trauma. The ABCMR must additionally render a finding on this issue.

        1. In the case of an affirmative finding on this issue, the ABCMR must review Mr. White's claim with liberal consideration as to whether his PTSD potentially contributed to the circumstances resulting in his discharge or dismissal. The ABCMR's application of liberal consideration must be substantively consistent with the Court's explanation of liberal consideration in this opinion.

        2. In the case of a negative finding on this issue, the ABCMR need not review Mr. White's claim with liberal consideration.

c. Pursuant to RCFC 52.2(b)(1)(B), the ABCMR shall **COMPLETE** its remand review within **120 days**. This deadline is subject to good faith extension under RCFC 52.2(c)(1).

(3) During the requested remand:

a. Pursuant to RCFC 52.2(b)(1)(C), the Clerk of Court is directed to **STAY** all proceedings in this matter until further order of the Court. The Court will retain jurisdiction over this case during the remand period.

b. Pursuant to RCFC 52.2(b)(1)(D), the defendant shall **FILE** a status report on or before **February 17, 2026**, and **every 30 days** thereafter, during the remand period.

c.  Pursuant to RCFC 52.2(d), within **10 days** of the conclusion of the voluntary remand proceedings before the ABCMR, the ABCMR shall **SERVE** all counsel of record in this case with a copy of the ABCMR's final decision and **SEND** the Court a copy of the ABCMR's final decision.

d.  Pursuant to RCFC 52.2(e)(1), within **30 days** of the filing of the ABCMR's final decision on remand, the parties shall **FILE** a joint status report with the Court setting forth the parties' position(s) regarding whether further litigation of this matter is necessary.  If further proceedings are warranted, the parties shall include a proposed schedule to govern this case going forward.

(4) The Clerk of Court shall **SERVE** a copy of this opinion and order on the Army Board for Correction of Military Records:

> Joseph P. Lister
> Director, Army Board for the Correction of Military Records
> Army Review Board Agency
> 251 18th Street South – Suite 385
> Arlington, VA 22202-3531

It is so **ORDERED**.

Armando O. Bonilla
Judge